Ms. Borodkin, you may proceed. Good morning. May it please the Court, Lisa Borodkin, I'm here with Howard King and Damian Robinson for the plaintiff and appellant, Elinor Shapiro. We're very happy to see Judge Malloy here. We cited Judge Malloy's opinion in the Avidare v. Rolls-Royce trade secrets case from the Eighth Circuit. It's an incredibly useful and helpful case and we're asking the Ninth Circuit today to make a similar published order that will help inventors, artists, creative people, and district courts in this circuit on some very basic but easy to misunderstand tenets of trade secret law. First of all, it's very important for the Ninth Circuit to give guidance that California recognizes trade secrets in compilations of information, even when the individual discrete elements are previously known or in the public domain. Every other circuit that we cited, I think it's all of them except for the First Circuit, does recognize that trade secret protection resides in the Uniform Trade Secrets Act for such combinations. Let's assume that we agree with you that the California statute protects a compilation of information. We review the district court's decision here for abuse of discretion because this is a preliminary injunction case. Tell me how the court abused its discretion in finding that we weren't really dealing – we were either dealing here with information that was already in the public domain or that The district court abuses its discretion when it bases its order on erroneous conclusions of law or clearly erroneous findings of fact. Or it's not an abuse of discretion, but it can also be reversed for failure to make sufficient findings of fact and conclusions of law under Federal Rule 52A sufficient to permit appellate review. In particular, the crux of this appeal is that the district court erred by failing to identify and determine as a matter of law what Shapiro's trade secrets actually were. We briefed it numerous times, each of the discrete elements and each of the two general types of trade secret. Trade secret number one was a snow globe collectability device, which is a marketing device. It's information about a marketing opportunity. Trade secret number two, which is the compilation trade secret, which comprised nine discrete elements of fact. As to number one, as I understand the record here, first there was in existence whatever the erst product was, but second the judge found as a matter of fact, and the record seems to compel that, that before your client came to see Hasbro, they'd already put together a two-inch pony with the glitter floating around inside. Fair? Correct in that those were findings that were made, but it didn't... And those findings are supported by the record. You're not attacking that finding. They're not. No, no. No, they're not. Why isn't that finding enough to demonstrate that your trade secret number one wasn't a trade secret? Because it's impossible according to the timeline of the case, and this is where review of Avid Air versus Rolls-Royce would be instructive. Toys that were released in 1993 by Ertl from Dyersville or Dwyer, Iowa, are not timely for the market for girls in 2014. Move past Ertl. Move past Ertl. I'm talking about the product that Hasbro had. That's not the same product. There was unrebutted expert testimony in the record that said that's a different category. The tooling in... Because it's two inches rather than four? Correct. The tooling is incredibly expensive. You have to order it from Hong Kong. When they commit to release a product, they have to invest in the tools that actually can make the plastic injection toy. And there were four unrebutted expert declarations. Even if you disregard Shapiro's, which is another two, that's saying it's a different opportunity, it's a different product. That's a toy that was never released. That was not this toy. But if the trade secret is, and I want to define the trade secret carefully because it's the one you said is number one. If the trade secret is glitter suspended inside of the... That's what you said it was. It's not. What is it then? Okay. What the court just... Number one, not number two. The court just said is a nonce phrase that was coined by Hasbro to confuse the district court and invite error. I asked you a question. It's the device. It's the device. What is trade secret number one? It's a marketing device, a way to sell toys to identify an opportunity in the market that no toy company had ever sold a line of collectible dolls to little girls in the three to four inch small doll category using the three elements of totally clear animal shaped receptacle in which glitter and liquid floated where the shape of the glitter told the story or the character trait of each character in a line that has to be three or more. Well, how does that... How is that distinguishable from other than size from what Hasbro had already developed? Because a little girl... I know you're arguing size is important. Correct. Two inches versus three to four inches. Correct. But other than size, what's the distinction? Hasbro didn't develop the toy. A little girl cannot play with an Adobe Photoshop file. What's she going to play with? The computer file? Shapiro actually went to the trouble of developing physical models in secret and keeping it secret and then testing it with focus groups of little girls in the age group so that she could observe the consumer behavior reactions and do what's generally accepted in the toy industry as a checks and balances marketing confirmation that this is a viable toy line, it will sell, it's new, it's familiar, it's something little girls would like. And little girls were not testing. Hasbro did not test. They had no data. It's just like that Hallmark versus Monitor case in the East Circuit that followed Avid Air versus Rolls-Royce. So number one, Hasbro didn't develop a toy. First of all, the trade secret is not the toy. The trade secret is the package, how to sell it, how to effectively communicate... That's your trade secret number two, is it not? It's more broken down in trade secret number two with the device in marketing. Right. I'm asking you to define these trade secrets for me and you keep saying the district court made a mistake but now you're mixing the two of them together. So tell me why your number two is different than your number one. Number two specifically listed all of the components that go into marketing and that includes part... It includes packaging. You have to package the toy properly otherwise the consumer doesn't know what's new and different about the toy and why it's a new opportunity and something that they would want to buy and why they would want to collect all the characters in the line. Hasbro never showed shaped, heart-shaped or star-shaped glitter. They showed two characters and actually the little two-inch models that we've asked to be added to the record aren't even in the shapes that match the character. Those characters are Rainbow Dash and Pinkie Pie so their glitter should be cloud and rainbow shaped or like balloons and cupcakes according to that narrative in that world. Shapiro modeled and explained in her slideshow, look here's a road map how to sell toys. This is going to be different from any other small doll line because the shape is the glitter. Shape of the glitter has never been seen before and our product designer said, yeah, that's never been done. She's a world expert in designing dolls. Let me ask you maybe a more fundamental question about this. I think our jurisprudence on injunctions kind of gotten away from the concept that we used to always say, one of the first things you ask about in injunctive relief is, is there an adequate remedy and damages if the injunction's not issued? And so let's jump over the likelihood of success and assume you could even get over that hurdle. Why can't, why can't this case be resolved by Hasbro paying you a boatload of money down the road if, if, if you win? Because it would gut the California Uniform Trade Secrets Act. When legislature enacted CUTSA, the California Uniform Trade Secrets Act, they were vindicating an important public policy in California. You can enjoin threatened or actual misappropriation of trade secret information. And to this day, no- So are you suggesting that the normal standards for a federal district court, when it considers issuing a preliminary injunction, don't apply in a California Trade Secrets Act case? That the injunction is automatically available on a showing of violation? Of course not. That's, that's not, that's not the argument. Judge Belay says, maybe you get a zillion dollars from Hasbro if you win in front of the jury. Why are you being irreparably harmed by their continued marketing of whatever they're marketing? Oh, Hasbro admits in its position that it would be irreparably harmed in the form of lost goodwill, intangible business opportunities, relationships with customers. That's not the question I'm asking. Let's assume you get to, let's assume you don't get the injunction and you go to a jury and the jury rules in your favor. And the jury awards you whatever amount of damages are appropriate under the circumstances. Why isn't that a happy day for your side? Because it took us two years to get there and the trade secret was destroyed. And if Hasbro had not destroyed it- Isn't it already destroyed? No, it's not. In your view? In our view, it's not destroyed. The whole world now knows what, what this product looks like, what the concept looks like, and what their marketing scheme, which may or may not match yours, looks like. So if you're right, hasn't your trade secret already been exposed to the world? Even if that's true, it's not a reason to deny the injunction as to Hasbro because Hasbro is the disclosee who received it under a fiduciary duty to maintain it confidential. The question is, is not whether that's a reason to deny the injunction, but I still haven't heard a good answer to Judge Malloy's question, which is, if you get a nice damages award at the end of the case, and attorney's fees, and a pat on the back from the district judge, haven't you received an adequate remedy at law? Well, no. Not fully. Because of the timing. She's missing out on the credit, the attribution for having invented this. And by the way, it's not disclosed to the whole world because no one else in the world has seen her slideshow. Her slideshow is- But hasn't Hasbro taken the product to market? The infringing product that you say violates trade secret, they've already taken it to market, right? Yes. And so the trade secret has been lost or disclosed, whatever word you want to use, at this point. So why isn't damages an adequate remedy? Well, there's two answers to that. If I may, I'd like to address them and save a couple minutes for rebuttal. They haven't- they're not done dismantling the trade secret. There's two more lines of products that we know are coming that are variations also taking- And even more damages. Well, CAATSA allows for an injunction. If you have an employee who takes all your trade secrets, moves to another company, and then uses all the trade secret information, that employee can be enjoined. Now, there's no doubt someone can be enjoined. Right. What we're asking is, applying the normal factors that a district court applies in granting a preliminary injunction, could a district court in your circumstance say, she's proved a nice case. He didn't say that. The district judge didn't say that. Right, right, right. But- What's the irreparable- But damages will be fine. What irreparable harm? Yeah. It destroyed the novelty of the toy market. And you're saying, let's assume it's destroyed. What's irreparable about the harm is that she missed a moment in time. Unless Hasbro's enjoined, there's no public policy served by the injunction. It's to deter people from stealing other people's trade secrets. With that, if I might, unless- Please. Do you have more questions? I'll reserve a couple minutes. The rest of your time. Mr. Krumholz. Thank you, Your Honors. Josh Krumholz on behalf of Hasbro. To get to the point that Your Honors were raising, a boatload of money would be a strong deterrent indeed. And- But the district judge didn't, in this case, to be fair, say, I find that the other factors aren't met. The district court thought that on the merits, there was no particular likelihood of success. I think the court weighed the relative harms. Right? So we have the second and third factor. Right? The second factor is irreparable harm. And the third factor is the weighing of the harms. And she, I think, conflated those two factors in her analysis. But she did explicitly say that the harm to Hasbro outweighs the harm to Ms. Shapiro. And she did also make an express factual finding that any harm to Ms. Shapiro is vague, I think is the word that she used. So she did make findings along those lines. Are those findings independent of the lack of probability of success finding? Or do they just, are they derivative of it? They're independent. I think that the last prong, the public interest piece, is dependent on it. Because on the public interest, she said, they're two independently created ideas. They both have a right to protection. Therefore, that element has not been met. I think that's dependent on the likelihood of success. But to your questions about money damages, this is a quintessential money damages case. Right? Because this is not a case where Ms. Shapiro was out there trying to make the product. She was not out there to compete against Hasbro or somebody else. She was out there to sell her idea. And in exchange for selling her idea, she received royalties back. So what she is seeking is essentially the royalties that she would have received had, in her view, Hasbro done what it was supposed to do. So she will be fully compensated in every material respect if she is able to prevent the case. Right, counsel. Judge Gould, if I could ask. On that issue, are the damages proved by expert testimony? That is, an expert says, here's what the royalties would have been on such a product? Or is there some other way? Yes, Your Honor. Given the status of this case, we actually have already submitted expert reports. And they're, well, they've submitted expert reports. Ours are due in a few days. And they have a damages expert and two industry experts who purport to do an analysis of what the reasonable royalties should be, in addition to the fact that they're looking for profits on top of that as well. Okay, thanks. And so when the, just staying with this general topic, when the court made the factual finding that the harm to Hasbro was greater than the harm to Ms. Shapiro, that is not anything that, frankly, Ms. Shapiro in her papers have disputed. And the record, there was ample support in the record for the court's findings. When you look at Hasbro's harm, if an injunction were to be entered, you first start with the But beyond that, and probably even more important than that, is they had contractual relationships with major retailers, not only around the country, but around the world. And if the injunction had entered, not only would you have the intangible, irreparable harm of the relationship itself and what that would mean, but they could be breaching contracts. I mean, they're just going to be flat-out breaches of contract because of a lack of fulfillment of the contractual terms. And then you have the cascading harm to the retailers themselves. You know, this is a very precise business. You need to fill your shelves with certain price points. And this was... Let's assume for a moment that the district judge had said, yeah, I think on the merits, Ms. Shapiro is quite likely to prevail, that I've concluded from this record that Hasbro stole her ideas and used them. Could the court, would the court then have abused its discretion by not granting an injunction? No, I think it would have abused its discretion by granting an injunction because when you look at the Winter case in the Supreme Court and then the Alliance case by this circuit interpreting it, it's clear that while there is still a sliding scale, we certainly agree that there's a sliding scale, the plaintiff still has the burden of showing that all four elements have been met, right? And if the court concluded factually that the harm to Hasbro was greater than the harm to Ms. Shapiro, the court would have abused its discretion by entering an injunction. Does CUTSA speak, I'm using this acronym now, does CUTSA speak of preliminary injunctions in the statute or merely the ability to enjoin? I think just the latter. I don't... So is an injunction perhaps available at the conclusion of this case? Oh, certainly. Certainly. And this case is set for trial in September, which is obviously not that far away. But to that point of, you know, getting an injunctive relief under CUTSA, you know, we've seen this in the patent world where there was a presumption for an injunction until eBay came down from the Supreme Court. It sounds like Ms. Baratkin wants to kind of impose an eBay world, a pre-eBay world on the trade secret world. And there's clearly no case support for that. And if you're going to look at anything, you would look at how the Supreme Court has rejected that in the patent world. How about California courts? What have they done? They've applied the four prongs, you know, appropriately. Not anything unusual for trade secret cases that I'm aware of. Can you address the judge's finding of an independent creation, at least preliminary finding of independent creation? Sure. So there was... The court struggled, as I think happens in these trade secret cases, to identify what the trade secret is, right? So let's deal with this so-called trade secret one, which is however you want to describe it. It's a concept of shaped glitter in liquid in a dollar toy where that shape is associated with the character and it's part of a collectible set, right? We submitted... The court found that there was independent creation and the record amply supports that. We submitted the declaration of Andrea Errett. She was the senior designer responsible for the accused toys. In her declaration, she attaches a number of documents showing that she initially came up with the general idea in October 2011 while still working on the Littles Pet Shop toy line. She brought that idea with her in November 2011. By July 2012, she had created the so-called mood board that talked about glitter slash shapes in liquid in the ponies. And she sent that in July 2012 to Hasbro Far East to ask for models. Those models were created. All of this is before anybody at Hasbro has even heard of Ms. Shapiro. And then on top of that, and this is in the record, the court didn't get to it in that much detail because there's such a plethora of evidence to support her holding. But on April 22, 2013, which is three days before the initial meeting with Shapiro, 14 days before her submission, six weeks before anybody looked at it, she has what's referred to as the PIQ, which is the price initial quote, I mean the product initial quote, that indisputably has everything in it. It refers specifically to having liquid and glitter and that glitter is shaped and it's individual for each toy in the line that have been around since 2003. So, you know, the court noted at the hearing that there is probably an unusual amount of independent creation evidence here. How did you want, what do you understand trade secret number two to be and what's your defense as to trade secret number two? That is much more amorphous. So basically, as I articulated or iterated in many different ways, but basically as I understand it, it is the submission as a whole and the submission as a whole has various components to it, which include the sculptures themselves, how to make the sculptures, you know, text ideas, a whole set of ideas. But I think what the court struggled with is, okay, that's fine, but what is it that is potentially in the accused toys for me to look at and understand? And aside from the shaped glitter, which is, you know, concrete enough to talk about, the only thing she could find that was potentially in there was this, you know, call-out concept for packaging, basically calling out the idea of shaped glitter. And what she found on the record, she found, I think, three things on the record. One is to the extent we're going to compare the call-outs, how it's done, how the information is pulled out, it's much different in the wishable submission than how Hasbro ended up doing it. She found on the record factually that even if we credit this as some idea, it was in the public domain, the Erdl toys had call-out for packaging that talked about the magic in the wings, which was the same thing. And then she also concluded, which I think is also correct, that this is just kind of an abstract idea that's not worthy of trade secret protection because it is just a marketing technique that's been known for decades and there's nothing to protect around. There wasn't a contention in this case, as I recall, that the – it was the concept of the call-out that's the trade secret. Was there a contention that the call-outs were so similar that – that even if the concept weren't a trade secret, that in effect you copied her call-out? The honest answer is I don't know. I'm trying – I'm – I say that not knowing the answer to it. And I say it – and I don't say it flippantly because the reason – I think the answer is no. I mean, the language is different. The language in the wishful submission is, you know, if your wish is wisdom, my star – my symbol is a star. And ours is – what is our – our specific wording is different. It's filled with cutie mark glitter, two completely different phrases. So, for example, if you had used exactly the wording that Ms. Shapiro used in hers, that might give rise to a trade secret claim. I think it certainly – you know, depending on the wording and how generic it was, it could certainly give an implication that maybe somebody used something here. Even if the concept of a call-out were public knowledge. Yeah. I think in that hypothetical, what it would probably be is pretty good evidence that somebody probably was influenced by the submission because that's too big a coincidence. That's why I say it matters how generic the words could be. So, you know, hypothetically, we would see that. So I think there is ample evidence for the court to have found independent creation. But I would also observe that beyond independent creation, it's also Ms. Shapiro's duty to show affirmative evidence of misappropriation, to show affirmative evidence of use. And if we just, you know, posit a record where we didn't have the independent creation, all we would have is that there was a submission made and that products came out, you know, more than a year later, some of which had overlap with some of her – some aspects of her submission. And that – you know, she's the one that decided to bring this preliminary injunction motion. She's the one that decided to do that without garnering any evidence, not that the evidence thus far has supported her claims. But she's the one that decided to go to this court, to the court below, and take the court's time to ask for a preliminary injunction without any evidence whatsoever that anybody that saw the submission had anything to do with the accused toys. Although, you surely would have enough evidence to go to a jury, wouldn't you, if somebody brought in a submission, the company produced a very similar toy a year later. That would be enough, I think, to put the burden on the – on the company that produced it to show that they didn't really use it, wouldn't it? I – you know, I think I would need to know more about the facts between that. But if I only knew – if I only knew that, I would say you had enough to create a question of whether or not there was copy. If I brought a concept to you and then a year later your company used it, I'm not sure I'd have to come in with proof of which people knew what when. I think I'd say, I brought you this unique thing, a year later you produced it, I got a pretty good case. Right. If you had, like, no isolation, we couldn't explain how we got it. Yeah. The burden would be on you. You – well, I don't think legally the burden would be on us, and that's – obviously this is a theoretical discussion, because we – that's a very different standard than what we're dealing with today. But I would – I mean, if you're asking me whether, as a technical – I would be comfortable with that. It's the argument you're making. That's why I'm responding to it. Well, but – and that's fair enough, but I do raise the argument now because it is their burden. They're seeking extraordinary relief, and to come into court without having affirmatively shown anything – because bear in mind, when you look at the submission, right, the submission is about this whole wishables concept. It is about Mount Wishmore and, you know, and having secret messages under, you know, the figures. This is just one component to it. You know, to take your hypothetical, if they submitted a wishables idea and a year later we came out with a wishables idea, you know, I think the case would have settled, you know, long before that. Right. And they also wouldn't have to prove which people in your company knew what when. Right. Right. That's why I say it's hard – even though you're right, you're reacting to my argument – it's hard in the abstract to answer that question because you need to fill in the gaps. But it's their burden to fill in gaps. It's not our burden to fill in gaps. But I don't want to get too deep into that because we have filled in the gaps and we have shown that. Let me just ask one real quick question in the short time you have remaining. Your opposing counsel sort of dismissed the Erdl precedent. What significance is there to the Erdl toys? The Erdl toys contained everything that she has identified as her core trade secret. Right. There was a line of six angels, four animals. They all had shaped glitter in liquid in their wings. The shaped glitter was associated with the individual characters. It's everything that she claims is novel and interesting. And it was generally found on the Internet. It wasn't that hard to find. We just did a search and it was there, still there today. You can still buy them today. In fact, the ones – I think you have ones, the physical examples – we bought them, you know, off the Internet. So what the court found – so tying it back to the judge, the judge found that this idea was already public. It was already publicly known, therefore not secret. And the court's obligation here, of course, is only to reverse if there is clear error. And I don't think there is any way one can say that there was clear error in her concluding that that secret was not a secret because it was publicly available. Thank you, Mr. Krumholz. Thank you. We took Mr. Krumholz over a little bit, so why don't we give three minutes to Ms. Spirocki. Thank you, Your Honor. First of all, I can point you right to where in the record Hasbro has already admitted that the district court fully understood and considered trade secret number one and trade secret number two. At pages 43 and 44 and 45 and 46 of Hasbro's opening – or answering appellee brief, they argue forcefully the district court totally understood what these two trade secrets were. So they can't go back and forth in saying it's uncertain, yet the district court understood them whatever they were. Judge O'Connell may be smarter than us, though, and that's what we're trying – we're trying to figure out what they are. Everything's briefed. All our citations to the record are to page site and to volume. But counsel brings up an important point. He says an idea is not protectable as a trade secret. This is an often misunderstood dictum from Silvaco from the California Supreme Court. Please, it would be very helpful for the Ninth Circuit to clarify it. In the context in which that statement was made, they meant that where the product automatically discloses an idea, and it's therefore no longer a protectable idea, here in the case law that came after, Altavion, notably, in the California Court of Appeal – and now we're begging the Ninth Circuit to make this finding as well – if the concept is not commercially released and doesn't meet the standard for relative secrecy or not generally known in the industry, the concept itself can be trade secret information, depending on how specifically it's been developed, that it is shown to have value, and that reasonable steps to maintain secrecy were taken. So please help us, and let's clarify Silvaco. That sounds like you want us to fix all the California laws, the California Court of Appeal. Well, it's surprising. I mean, it's surprising the Ninth Circuit doesn't have a lot of trade secret opinions. So we're – you know, when the district courts need to cite something, they have to go out of our circuit to find a case, and then say, well, under UTSA and CUTSA we can look at analogs. You know, I said they just went to California. You're telling us the California courts haven't done a good job defining this stuff. Well, it would be nice. Some of the district courts, I think they like Ninth Circuit cases to cite. It's nice to have, because we've cited California state court law to the district court, and for some reason, the district court didn't follow Altavion or Silvaco, and seemed to just then revert to this Eastern District of California case that preceded it, that we don't think is really factually similar to the facts. But I want to just run through with my few seconds left a couple of the points that you were making. We did argue. We argued at page 20 and 21 of our brief that the district court failed to make essential findings of fact on the relative harm to Shapiro. We cited Lamb-Weston v. McCain, Ninth Circuit case, and West – yeah, Lamb-Weston v. McCain, Ninth Circuit, 1991, that the statute protects potential value. Please look at that Curly Q. French Fry case. And the statute itself says that actual or threatened misappropriation can be enjoined. So we do think that it would cover preliminary injunctions. Thank you, Ms. Boratkin. Thank you, counsel. And we will submit this case. The court will take a 15-minute recess, and we'll be back. All rise.
judges: Gould, Hurwitz, Melloy